IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ROSS MICKEALSON,<br><br>                    Plaintiff,<br><br>vs.<br><br>CUMMINS, INC.,<br><br>                    Defendant. | CV 16-75-BLG-SPW-TJC<br><br>**FINDINGS AND<br>RECOMMENDATION OF U.S.<br>MAGISTRATE JUDGE** |

Plaintiff Ross Mickealson brings this action against Defendant Cummins, Inc. ("Cummins") for wrongful discharge, disability discrimination, and failure to accommodate in connection with the termination of his employment on April 22, 2015.  (Doc. 4.)

Judge Watters has referred the case to the undersigned under 28 U.S.C. § 636(b)(1)(B).  (Docs. 12, 21.)  Presently before the Court is Cummins' Motion for Summary Judgment.  (Doc. 26.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 28, 31, 32.)

Having considered the parties' submissions, the Court **RECOMMENDS** Cummins' Motion for Summary Judgment be **GRANTED** in part, and **DENIED** in part, as set forth below.

/ / /

1

## I.      FACTUAL BACKGROUND

Cummins designs, manufactures, distributes and services diesel and natural gas engines and related technologies.  (Doc. 15 at ¶ 3.)  Plaintiff began working for Cummins in September 2011 as a Sales Representative for Montana and Northern Wyoming, and was based out of Cummins' Billings, Montana branch.  (Doc. 30 at ¶ 2.)  During 2011-2013, Plaintiff alleges he had a very good relationship with his supervisor at Cummins, and had become a "top earner" with very good sales figures in 2012 and 2013.  (Doc. 30 at 42, ¶ 7.)

 In April 2014, William Colby ("Colby") became Plaintiff's supervisor. (Doc. 30 at ¶ 10.)  As part of the transition, Colby met with Plaintiff.  (*Id.* at ¶ 12.) The parties disagree about whether Colby discussed his expectations for Plaintiff at that time.  According to Colby's affidavit, they "discussed expectations for his role moving forward as well as some early performance issues, including communication."  (Doc. 27-7 at ¶ 4.)  But Plaintiff points to Colby's deposition testimony, wherein he agreed that Plaintiff "didn't have any clear expectations from [Colby] as his manager until approximately November of 2014."  (Doc. 30-3 at 5.)

In May 2014, Plaintiff told Colby he needed to take time off to tend to his parents' affairs due to his father's failing health.  (Doc. 30 at ¶ 13.)  Because Plaintiff was not eligible to take leave under the Family Medical Leave Act, Colby

arranged for Plaintiff to take an unofficial leave of absence. (*Id.*)  Under the arrangement, Plaintiff was permitted to work from Great Falls, Montana, and his work responsibilities were substantially reduced. (*Id.* at ¶ 13-14.)  Plaintiff maintained his regular pay and benefits during that time. (*Id.* at ¶ 15.)  Plaintiff returned from the leave of absence in October 2014. (Doc. 30 at ¶ 15.)

Following his return, Colby met with Plaintiff on November 11, 2014 to discuss performance expectations. (*Id.* at ¶ 16.)  During that meeting, Colby informed Plaintiff he was expected to work out of the Billings branch whenever he was not meeting with clients, to answer and return phone calls and emails in a timely manner, and to provide Colby with an email each Friday recapping events of the current week and his anticipated plans for the next two weeks. (*Id.*; Doc. 27-7 at 11-13.)  Plaintiff asserts these were significant changes from the working conditions he experienced during the first three years of his employment. (Doc. 29 at ¶ 8.)  He had previously been allowed and even encouraged to work out of his home office, and was provided more autonomy to "utilize [his] proven sales strategies." (*Id.*)

After being told that he was going to be required to spend more time in the office, Plaintiff raised concerns to Colby about his office space. (Doc. 30 at ¶ 20.)  Plaintiff told Colby that he had claustrophobia. (*Id.*)  He asserts that the small confines of the office, the lack of natural light, and the exhaust fumes from the

shop below, caused him to experience severe anxiety and made it difficult for him to concentrate and work.  (Doc. 29 at ¶ 21.)  Plaintiff had not considered this to be a problem before, but after being told he would be required to spend more time in the office, he voiced his concern.  (*Id.* at ¶ 20.)

Cummins alleges Colby identified various options for an alternative work space.  (Doc. 30 at ¶ 22.)  Cummins asserts that Plaintiff was provided with these various options, and the decision was ultimately left up to Plaintiff.  (*Id.*)  Plaintiff disputes this, and maintains that he was not authorized to move his office until April 2, 2015, several months after he raised the issue.  (*Id.*)

Also during the November 11, 2014 meeting, Plaintiff informed Colby that he had injured his shoulder that day when he fell on the stairs at work.  (Doc. 30 at ¶ 17.)  Colby instructed Plaintiff to report his injury pursuant to Cummins' policy.  (*Id.*)  Plaintiff thereafter received treatment through Montana workers' compensation for his shoulder injury.  (*Id.* at ¶ 18.)  He ultimately required surgery to repair his shoulder the following spring.  (Doc. 29 at ¶ 44.)

There is wide disagreement between the parties concerning the events between the November 11, 2014 meeting and March 2015.  Cummins asserts Plaintiff's communication with Colby remained poor through the end of 2014 and into 2015.  (Doc. 30 at ¶ 23; 26.)  According to Cummins, Plaintiff's communication deficiencies included failing to return calls, text messages and

emails.  (*Id*. at ¶¶ 24-25.)

Plaintiff disputes this, and maintains that his level of communication was adequate throughout this period.  (*Id.* at ¶ 26.)  Plaintiff states he does not recall the alleged unreturned calls and text messages, and asserts there is no evidence to corroborate those events.  (*Id.* at ¶¶ 23-25.)

Plaintiff also continued to obtain medical treatment for his shoulder during this time period, which included several visits to medical providers, physical therapy and a cortisone shot.  (Doc. 30 at 18; Doc 29 at ¶ 10.)  Plaintiff maintains that Cummins management was aware of his ongoing shoulder problems.  For example, Plaintiff refers to an email exchange between him and Coby on February 25, 2015.  (Doc. 29 at ¶ 15.)  Colby emailed Plaintiff at 11:06 p.m. requesting immediate attention to a sales forecast update.  (Doc. 29-1.)  Plaintiff responded at 11:19 p.m. advising he would get the report out that night, stating "[m]y shoulder is aching so bad I can't sleep anyway."  (*Id*.)

Colby conducted Plaintiff's 2014 annual performance review on Monday, March 2, 2015.  (Docs. 27-7 at 15-24; 29-17; and 30 at ¶ 28.)  Plaintiff received an overall rating of 2.4 out of 4.  (Doc. 30 at ¶ 29.)  The review stated Plaintiff "Needs Improvement" in eight categories, including the category "Responsive to customers, team, and company."  (Doc. 27-7 at 21.)  The review stated "Ross needs to continue to focus attention on making sure that we are answering all

phone calls, or returning phone messages within a reasonable amount of time (ideally in most situations within an hour or two), additionally, making sure that we are returning all emails within that same day." (*Id.*)  Cummins asserts that Colby stressed the need for Plaintiff to return all phone calls, particularly his, in a timely manner.  (Doc. 30 at ¶ 30.)

Plaintiff, on the other hand, interprets this section of the review as indicating he was, at that time, properly focusing his attention on maintaining good communication, and only needed to continue to do so.  (Doc. 29 at ¶ 41.)  He believes this interpretation is bolstered by the fact that Colby did not put Plaintiff on a performance improvement plan to address the issue.  (Docs. 30 at ¶ 23; 27-3 at 20.)

Colby also noted Plaintiff's physical condition during the performance review.  In an email sent to Cummins Human Resources Officer Taryn Nenow ("Nenow") the following day, Colby stated the review "went pretty well."  (Doc. 29-17.[1])  But he noted that "[Plaintiff] looked very exhausted & did not engage

---

[1] Cummins argues Plaintiff did not lay a foundation for the admissibility of this exhibit, as well as the exhibits filed at Docs. 29-13, 29-14, 29-15, and 29-17. Plaintiff states that these exhibits are true and accurate copies of documents he received from Cummins in discovery.  Cummins' objection overlooks the Court's Scheduling Order, which provides: "Pursuant to Fed.R.Civ.P. 16(c)(2)(c), the parties stipulate to the foundation and authenticity of all discovery items produced in pre-trial disclosure and during the course of discovery, unless . . . a discovery item is produced and the producing party objects either to its foundation or authenticity, the producing party shall so state, in writing, at the time of

much." (*Id.*)

Plaintiff was ultimately prescribed an opiate (tramadol) for his shoulder pain on March 2, 2015.  The following day, Plaintiff emailed Colby to inform him that he had been prescribed tramadol, and it allowed him to get a "decent night of sleep" for the first time in months.  (Doc. 29-1.)  But he advised he would not be reporting to work due to side effects from taking the medication, and he asked that Colby have a Human Resources representative call him.  (*Id.*; Doc. 30 at ¶ 33.)

Nenow responded by contacting Plaintiff by telephone on March 3 and sending a follow up email.  (Doc. 30 at ¶ 34.)  In her email, Nenow told Plaintiff to "'reply all' when you talk to the doctor to let us know if he thinks you should take more time off or do something different."  (Doc. 27-8 at 159.)  She also wrote "it['s] extremely important to communicate and OVER communicate with [Colby] while you treat the workers comp injury with physical therapy, doctor's visits, medication, etc.  He still needs to make sure the work gets done while you get the care you need."  (*Id.*)

During their March 3 telephone conversation, Plaintiff states that he informed Nenow that he would be absent the remainder of the week due to his new medication and its potentially hazardous side effects.  (Doc. 29 at ¶ 16.)  Plaintiff

---

production."  (Doc. 20 at ¶ 7(c).)  Here, Cummins has not shown that it timely objected to the foundation or authenticity of the documents it produced to Plaintiff. Therefore, Cummins objection to the consideration of these exhibits is overruled.

was thereafter absent from work on Wednesday through Friday, March 4, 5 and 6, and did not communicate further with Nenow or Colby during that time. (Doc. 30 at ¶ 35.)

Nenow had a different understanding from their telephone conversation. She called Plaintiff on Saturday, March 7, 2015, to inform him that per company policy, he had been a "no call/no show" for three days and his employment was subject to termination. (*Id.*)

Plaintiff disagreed, and on Sunday, March 8, 2015, he sent Nenow an email regarding their conversation the previous day, stating there was a miscommunication regarding his absence. (*Id.* at ¶ 36; Doc. 27-8 at 162.) Plaintiff stated he believed he had been excused from work for the remainder of the past week. (*Id.*) As required by Cummins' policy, Plaintiff also submitted a medical status form from his doctor, releasing him back to work. (*Id.*)

On Monday, March 9, 2015, Nenow sent Plaintiff an email instructing him to report back to work the following day on March 10, 2015, and stated "You **MUST** call [Colby] when you arrive." (Docs. 30 at ¶ 37; 27-8 at 161.)

Upon his return to work on Tuesday, March 10, 2015, Plaintiff sent an email to Nenow and Sandra Garcia regarding his claustrophobia and his office. (Docs. 29 at ¶ 22; 29-4.) Plaintiff inquired about health insurance coverage for counseling because Colby had suggested he try counseling to deal with the problem. (*Id.*)

Later that afternoon, Colby sent Nenow an email regarding Plaintiff's office. (Doc. 29-5.)  Colby confirmed he had suggested counseling, and that he had walked around the Billings branch in November to try and find an alternative work space for Plaintiff, but nothing ideal was identified.  (*Id.*)  He also stated that he had used Plaintiff's office earlier that month, and personally did not have any issues with it, and thought it was a great location to work from.  (*Id.*)

On the same day, March 10, 2015, Colby instructed Plaintiff that, going forward, Plaintiff was to call him every morning at 8:00 a.m. to communicate his plan for the day.  (Doc. 30 at ¶ 38.)  Colby also began keeping a log to document his communication with Plaintiff.  (*Id.*)  Cummins alleges that from the time Plaintiff received this instruction until his ultimate discharge on April 22, 2015, Plaintiff only called Colby at 8:00 a.m. as instructed on one occasion.  (Doc. 30 at ¶ 41.)  Nevertheless, the parties did have a number of other communications over the next several weeks.

Later in the evening on March 10 at 10:11 p.m., Plaintiff sent Colby an email acknowledging he was supposed to call at 8:00 a.m. the following morning, but he reminded Colby that he had physical therapy in the morning.  (Doc. 27-7 at 36.)  Colby responded and asked Plaintiff to call after his appointment, but Plaintiff did not call as instructed.  (Doc. 30 at ¶ 41.)

/ / /

Plaintiff then missed the next several days of work due to a stomach ailment, and he either called (once) or emailed Colby each work day from Thursday, March 12, 2015 through Tuesday, March 17, 2015 to let him know he would not be in and would be taking another "PTO" day.  (Doc. 30 at ¶¶ 41-45.)

After missing work on Monday, March 16, 2015, however, Nenow contacted Plaintiff in the evening and instructed him to call Colby to address several outstanding issues concerning his workload and customers.  (Doc. 30 at ¶ 44.)  When he again missed work on March 17, Nenow sent Plaintiff an email instructing that he must communicate with Colby about his workload and customers; his absences were unexcused; per Cummins' policy he needed a medical release in order to return to work because he had been absent from work for four days; and his failure to communicate with Colby was insubordination per Cummins policy, and if his conduct continued, he was subject to disciplinary action up to and including termination.  (*Id.* at ¶ 46; Doc. 27-8 at 166.)

Plaintiff interpreted Nenow's e-mail as a threat to terminate him "because of [his] medical absences and failure to continue working while home sick."  (Doc. 29 at ¶ 28.)  Plaintiff responded by contacting Cummins' internal grievance hotline (Ethics Point) on March 17 to report alleged discrimination, retaliation and lack of accommodation by Colby.  (Doc. 29 at ¶ 29.)  Rolana Bourland, a Cummins Human Resources Business Partner from a different region, was assigned to

investigate the complaint.  (Doc. 30 at ¶ 53.)

On Wednesday, March 18, 2015, Plaintiff again emailed Colby and Nenow to remind them he had a physical therapy appointment.  (Doc. 30 at ¶ 47.)  Nenow responded and asked him to call Colby after physical therapy, but he did not do so.  (*Id.*)  Colby also called Plaintiff and left a voice mail, asking him to call back so they could discuss Plaintiff's work status.  (*Id.* at ¶ 48.)  Plaintiff responded to Colby by email the same day, stating that he would send in a request for PTO use.  (*Id.*)

Plaintiff also contacted Ethics Point on March 18, 2015, and advised them that Nenow had directed him to call Colby.  Plaintiff told Ethics Point he did not want to do so because he feared Colby would "make up a false allegation (verbal threat) against him."  (Doc. 27-4 at 13.)  Plaintiff requested that someone from the company contact Nenow and inform her of this ongoing issue.  (*Id.*)  Following this conversation, it appears undisputed that Plaintiff did not call Colby directly throughout the pendency of his Ethics Point investigation.

On Thursday, March 19, 2015, Colby called Plaintiff twice, but Plaintiff did not return his calls.  (Doc. 30 at ¶ 49.)  Instead, Plaintiff sent an email to Nenow.  (Doc. 29-10 at 1.)  Plaintiff advised Nenow "confidentially" that he had reported "a series of events to corporate and they have assigned an investigator."  (*Id.*)  He told Nenow that he had asked that they contact her.  (*Id.*)  Plaintiff also advised Nenow

that he had great concerns in speaking with Colby for fear of "false accusation and subsequent policy violation." (*Id.*)  He also told her he would be a requesting non-paid leave to allow him to focus on his physical therapy and recovery from his shoulder injury. (*Id.*)

Nenow responded that afternoon. (*Id.*)  She told Plaintiff he would need to provide a doctor's note if his leave of absence is for medical reasons, and stated that if the leave was for personal reasons it would not be approved. (*Id.*)

On Friday, March 20, 2015 Plaintiff did not go to work and did not communicate with Colby. (Doc. 30 at ¶ 59.)  The same day, Nenow and Colby exchanged emails regarding Plaintiff's Ethics Point complaint. (Doc. 29-13.)  Nenow stated "[i]f this is the first time you've been involved or implicated in an investigation, you're doing great…it most likely won't be the last.☺" and she reassured Colby that "[i]t will be fine." (*Id.*)  Colby responded, "LOL…this is my second investigation in 2 months!  I'm sure it will come often w/my position!" and stated "[w]e are good; I just want to be super careful that we don't miscue or do something incorrectly." (*Id.*)

On Monday, March 23, 2015, Plaintiff emailed Nenow and told her he tried to see a doctor, but could not get an appointment.  He told her he would attempt to get an appointment the next day, and would keep her informed. (Doc. 27-8 at 176.)

Also on March 23, 2015, the Ethics Point investigator, Bourland, sent Nenow an email regarding Plaintiff's complaint.  (Doc. 29-14.)  Bourland referred to a potential commission Plaintiff may receive, and stated "[a]s far as the commission plan goes, [Plaintiff] made mention of the Stillwater project.  If the deal goes thru and he []is then subsequently terminated then the commission plan could play a part in his retaliation claims.  Trying to cover all the bases."  (Doc. 29-14.)

On Tuesday, March 24, 2015, Plaintiff saw Dr. Robert Wagenaar, a family practitioner, who noted Plaintiff presented with claustrophobia that had been inhibiting his ability to perform his current job.  (Doc. 30 at ¶ 61; Doc. 27-8 at 178.)  Dr. Wagenaar identified claustrophobia as a possibility based on Plaintiff's self-reported symptoms.  (Doc. 30 at ¶ 66.)  The appointment with Dr. Wagenaar is the only medical evaluation Plaintiff has received for claustrophobia.  (*Id.* at ¶ 67.)  Dr. Wagenaar released Plaintiff to return to work on March 26, 2015.  (Doc. 27-8 at 178.)  Dr. Wagenaar also stated Plaintiff "may do well to have accommodations made so that he is in a working environment that will relieve his claustrophobia."  (Docs. 30 at ¶ 68; 27-8 at 178.)

On Thursday, March 26, 2015, Bourland interviewed Plaintiff.  (Doc. 30 at ¶ 54.)  Plaintiff asserts that Bourland told him during the meeting that he did not need to have contact with Colby during the pendency of the Ethics Point

investigation.  (*Id.* at ¶ 55.)  Cummins disputes that Bourland told Plaintiff not to communicate with Colby during the investigation.  (*Id.* at ¶ 55, n.1.)  Rather, Cummins asserts Plaintiff made the request not to contact Colby, and Bourland said "that's reasonable."  (Doc. 32 at 9.)

On Friday, March 27, 2015, Bourland interviewed Colby.  (Doc. 27-4 at 19-25.)  Colby indicated it had been decided that Plaintiff would be terminated on March 6, 2015, after he missed three days of work.  (Doc. 27-4 at 25.)  But Colby told her the decision was retracted on March 9, 2015, after Nenow talked to Plaintiff.  (*Id.*)

On the evening of Friday, March 27, 2015, Nenow emailed Plaintiff and specifically informed him that his failure to respond to Colby's voice mails and emails was insubordination.  (Docs. 30 at ¶ 62; 27-8 at 180.)  She told him to call Colby at 8:00 a.m. on Monday, March 30, and if he did not, disciplinary action would result.  (*Id.*)  She also told him that his note from Dr. Wagenaar was insufficient because it did not address his stomach/flu symptoms, and Dr. Wagenaar was not qualified to diagnose a mental health impairment like claustrophobia.  (Doc. 27-8 at 180.)  She informed him that if he continued to seek an accommodation for claustrophobia, he needed to provide documentation from a mental health provider.  (*Id.*)  Plaintiff did not call Colby as directed.  (Doc. 30 at ¶ 63.)

On Tuesday, March 31, 2015, Colby informed Plaintiff via voice mail and two emails that an alternate work space had been located for him next to the Branch Manager's office.  (Doc. 30 at ¶ 70.)  Colby told Plaintiff to let him know if he needed assistance moving his items.  (*Id.*)  Colby also reminded Plaintiff he was supposed to call in daily at 8:00 a.m.  (*Id.*)  The following day, Plaintiff emailed Colby a forecast, but did not call Colby for the 8:00 a.m. check-in.  (Doc. 30 at ¶ 72.)

 On Monday, April 13, 2015, Justin Mann, the Billings Branch Manager, sent Colby an email informing him that Plaintiff was going to have surgery on his shoulder.  (Doc. 29-15.)  He stated he did not know when the surgery would be, or how long Plaintiff would be out afterwards.  (*Id.*)  Colby responded, stating it had been "one month and one-day" since he last physically talked with Plaintiff, and was unaware of what was happening.  (*Id.*) [2]

On Tuesday, April 14, 2015, Bourland notified Plaintiff that her investigation was complete, and the evidence did not substantiate any of Plaintiff's claims.  (Doc. 30 at ¶ 57.)  Therefore, he was advised the investigation was closed.  (*Id.*)

---

[2] Colby's "one month and on-day" statement apparently conflicted with an email Colby sent to Nenow on April 9, 2015 where he stated it had been "four days" since he last communicated with Plaintiff.  (Doc. 30 at 41, ¶ 4.)  Colby later testified that the April 9, 2015 email contained a typographical error, and he meant to write four weeks, instead of four days.  (Doc. 32-1 at 4-6.)

The following day, Colby attempted to contact Plaintiff, and left a voice message and email requesting a meeting with Plaintiff on April 22. (Doc. 27-7 at 33.) Plaintiff responded by email the next day, and advised Colby that he was having shoulder surgery, and was uncertain if he could attend the meeting. (*Id.*) He also sent a second email to Colby on April 16 regarding his schedule. (*Id.*) On Monday, April 20, Plaintiff notified Colby that he would be available for a meeting on April 22. (*Id.*) On Wednesday, April 22, 2015, Colby and Nenow traveled to Billings and terminated Plaintiff's employment. (Doc. 30 at ¶ 76.)

Cummins asserts Plaintiff was terminated for insubordination for failing to communicate with Colby. (*Id.* at ¶ 74.) Plaintiff claims he was terminated because he sought accommodations for his disabilities, and because he submitted an internal grievance reporting his supervisor's failure to accommodate his disabilities. (*Id.* at ¶ 77.)

On May 12, 2015, Plaintiff had surgery on his shoulder. (Doc. 29 at ¶ 44.)

## II.    DISCUSSION

Cummins argues summary judgment is proper in this case because the undisputed facts demonstrate it had good cause to terminate Plaintiff for insubordination; its reason for terminating Plaintiff's employment was not false or pretextual; and it accommodated Plaintiff's claustrophobia and shoulder injury.

In response, Plaintiff argues genuine issues of material fact exist regarding

16

whether there was good cause for his termination, whether the stated reasons for his termination are pretextual, whether Plaintiff's claustrophobia is a disability, and whether Cummins reasonably accommodated his shoulder injury and claustrophobia.

### A.  Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.*  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the

burden of proof at trial.  *Id.* at 322-23.  If the moving party fails to discharge this

initial burden, summary judgment must be denied and the court need not consider

the nonmoving party's evidence.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-

60 (1970).

   If the moving party meets its initial responsibility, the burden then shifts to

the opposing party to establish that a genuine issue as to any material fact actually

does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  In attempting to establish the existence of this factual dispute, the

opposing party must "go beyond the pleadings and by 'the depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there

is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P.

56(e)).  The opposing party cannot defeat summary judgment merely by

demonstrating "that there is some metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216,

1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of

the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at

252).

   When making this determination, the Court must view all inferences drawn

from the underlying facts in the light most favorable to the nonmoving party.  *See*

*Matsushita*, 475 U.S. at 587.  "Credibility determinations, the weighing of

evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, [when] he [or she] is ruling on a motion for

summary judgment." *Anderson*, 477 U.S. at 255.

"The district court may limit its review to the documents submitted for the

purpose of summary judgment and those parts of the record specifically referenced

therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th

Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a

genuine issue of triable fact. *Kennan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996)

(citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

### B.    Wrongful Discharge Claim

Montana's Wrongful Discharge from Employment Act ("WDEA"), states:

(1) A discharge is wrongful only if:

> (a) it was in retaliation for the employee's refusal to violate public
> policy or for reporting a violation of public policy;

> (b) the discharge was not for good cause and the employee had
> completed the employer's probationary period of employment; or

> (c) the employer violated the express provisions of its own written
> personnel policy.

Mont. Code Ann. § 39-2-904.

The WDEA defines "good cause" as "reasonable job-related grounds for

dismissal based on a failure to satisfactorily perform job duties, disruption of the

employer's operation, or other legitimate business reasons." Mont. Code Ann. §

39-2-903(5).  A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and…must have some logical relationship to the needs of the business."  *Baumgart v. State of Montana*, 332 P.3d 225, 231 (Mont. 2014) (quoting *Sullivan v. Continental Const. of Montana, LLC*, 299 P.3d 832, 835 (Mont. 2013)).

A court may not substitute its judgment for an employer's discretion in employment matters: "[i]t is inappropriate for courts to become involved in the day-to-day employment decisions of a business."  *McConkey v. Flathead Elec. Corp.*, 125 P.3d 1121, 1126 (Mont. 2005).  However, the Montana Supreme Court has clarified that:

> An employer's legitimate right to exercise discretion over whom it will employ must be balanced, however, against the employee's equally legitimate right to secure employment.  The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business.

*Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 8 (Mont. 1993)).

"To defeat a motion for summary judgment on the issue of good cause, the employee may *either* prove that the given reason for the discharge is not good cause in and of itself, *or* that the given reason is a pretext and not the honest reason for the discharge."  *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441

(Mont. 2008) (emphasis added) (quotations omitted).

      1.    <u>Good Cause for Termination</u>

Cummins maintains that it had a legitimate business reason for terminating Plaintiff's employment, and therefore he was terminated for good cause as a matter of law.  Specifically, Cummins argues it had good cause because of Plaintiff's "refusal to follow Colby's instructions to return his calls and emails and his brazen refusal to communicate with Colby for almost six weeks."  (Doc. 28 at 10.) Cummins argues that this conduct "fell squarely under the definition of insubordination" in its employee handbook.  (*Id.*)

The Cummins Employee Handbook contains a Facility Rules and Responsibilities section that describes certain types of prohibited conduct, including "refusing to obey an instruction or order from a lead person or supervisor or any form of insubordination while on the job."  (Doc. 30 at ¶ 7.)  The Handbook expressly states that a violation of the Facility Rules and Responsibilities will result in disciplinary action up to and including termination from employment. (*Id.*)  The Handbook also contains an attendance policy that provides "[a]ny absence due to illness or injury which exceeds three workdays requires a release from a doctor before employees may return to work."  (*Id.* at ¶ 8.)  Plaintiff received and was expected to read and be familiar with the contents of the Handbook.  (*Id.* at ¶ 9.)

Plaintiff responds that his discharge was not for good cause.  Plaintiff argues Cummins' reason for terminating him is whimsical, arbitrary, and capricious under the circumstances of this case because he was meeting his performance goals, was told he could restrict his communication with Colby by the Ethics Point investigator, and was also suffering from serious medical and psychological issues at the time.

There can be no serious dispute that a company has good cause to terminate an employee for insubordination.  *See e.g. Mysse v. Martens*, 926 P.2d 765, 771 (Mont. 1996) (finding there was good cause to terminate employee who refused to perform her job duties); *Bourdelais v. Semitool, Inc.*, 77 P.3d 555, *5 (Mont. 2003) (unpublished) (holding employer had good cause to terminate employee who failed to follow his work schedule).  On its face, then, Cummins' reason for terminating Plaintiff appears to be good cause.  It is undisputed that Plaintiff did not call Colby daily to check in at 8:00 a.m. after he was directed to do so on March 10, 2015. (Docs. 27-7 at 28-33; 30 at ¶¶ 40, 45, 47, 48, 49, 59, 61, 63, 72, 73.)  The evidence also shows Plaintiff had very few communications in other forms with Colby from March 10 to the date of his termination.  (*Id.*)

Nevertheless, the Court finds Plaintiff has raised genuine issues of fact regarding whether Cummins' reason for terminating him was whimsical, arbitrary or capricious, in light of the circumstances.

First, during the six week period of Plaintiff's alleged insubordination, Plaintiff was often out of the office and not working due to his shoulder injury and medical treatment, the side effects of his medication, and stomach problems.  After his performance review on March 2, for example, Plaintiff was absent from work for health-related issues from Wednesday March 3 through Monday March 9. Then, after being instructed by Colby on March 10 to call each day at 8:00, Plaintiff was out the morning of March 11 for physical therapy, and was again absent for work with a stomach ailment from Thursday March 12 through Tuesday March 17.  While Plaintiff did not call Colby at 8:00 a.m. each morning while he was out sick, he either called or sent an email to Colby each work day between March 11th and the 17th to advise him of his health status and that he would not be at work.  A jury considering these facts could reasonably conclude that Plaintiff's failure to contact Colby at 8:00 a.m. each morning was not due to insubordination. Rather, Plaintiff reasonably believed that he was not required to contact Colby at 8:00 a.m. with his "plan for the day," when he was off work due to health issues.

In addition, Plaintiff contends that he did not contact Colby after March 17, 2015 because he had filed an internal grievance against Colby, and did not think he was required to call him during the pendency of the grievance.  Plaintiff points to evidence in the record to support his contention that Cummins knew this was the reason he was not contacting Colby, and that he had been assured by Cummins that

23

this reason was acceptable.  Following the initiation of his complaint, for example,

he voiced his concern with having direct contact with Colby when he discussed his

grievance with Ethics Point on March 18.  He advised Ethics Point that he did not

want to contact Colby for fear that Colby would make a false allegation against

him.  Plaintiff also asked that someone from Cummins contact Nenow and advise

her of the issue.  He also reiterated the same concern in an email to Nenow the

following day, and advised her he did not feel comfortable talking to Colby.

Then, when Plaintiff met the Ethics Point investigator, Rolana Bourland, on March

26, he maintains that Bourland affirmed that he need not have contact with Colby

during the pendency of the investigation.  (Doc. 27-1 at 53-55.)  It is immaterial

whether she expressly approved the non-communication, as Plaintiff alleges, or

agreed that such a request was "reasonable," as Cummins maintains.  At a

minimum, he was told by a Cummins representative that not contacting Colby

during the pendency of the investigation was reasonable course of action.

   After the investigation was concluded on Tuesday, April 14, Colby initiated

contact with Plaintiff the following day on April 15 to set up a meeting with

Plaintiff on April 22.  Colby traveled to Billings on that date and terminated

Plaintiff's employment.

   Again, a jury considering these facts could reasonably conclude that

Cummins was aware of the reason Plaintiff was not contacting Colby during the

pendency of the investigation, and that a Cummins representative had approved the non-communication.  Therefore, a jury could determine from these facts that the reason given for his termination (insubordination) was false, arbitrary, or capricious and unrelated to the needs of the business.

Accordingly, the Court finds there are genuine issues of material fact regarding whether Cummins had good cause to terminate Plaintiff for insubordination.

### 2.   Pretext

Even assuming Cummins had good cause to terminate Plaintiff, his claim may survive summary judgment if he can show there is a genuine issue of material fact as to whether the reason he was fired was pretextual or dishonest.  *Becker*, 191 P.3d at 441.  To defeat summary judgment on the issue of pretext, "the employee 'must prove that the given reason for the discharge…is a pretext and not the honest reason for the discharge.'"  *Arnold v. Yellowstone Mountain Club, LLC*, 100 P.3d 137, 142 (Mont. 2004) (quoting *Mysses*, 926 P.2d at 770).  The employee must present some evidence in the record substantiating his claim of pretext; "mere denial or speculation will not suffice."  *Johnson*, 152 P.3d at 734-735.

Plaintiff maintains that Cummins actually terminated him for requesting an accommodation of his disabilities and for submitting an internal grievance against Colby.  In response, Cummins contends Plaintiff has failed to show that its

justification for terminating him was pretextual.

The Court finds there are also factual issues relevant to the question of pretext that preclude summary judgment.  First, Plaintiff points to evidence that Colby and Nenow were already prepared to terminate Plaintiff even before the commencement of the six-week period of alleged insubordination.  Colby acknowledged in his interview with Bourland that he and Nenow had previously decided to terminate Plaintiff on March 6, 2015 when he was out of work for three days for health and medication issues, but later reconsidered the decision.  (*See* Doc. 27-4 at 25.)

Plaintiff has also presented evidence to support his contention that Cummins had already decided to terminate him prior to the Ethics Point investigation.  For example, shortly after Plaintiff submitted the grievance against Colby, and before Bourland even met with Plaintiff, Bourland sent an email to Nenow stating she was "[t]rying to cover all the bases," and mentioned that if Plaintiff was terminated "the commission plan could play a part in his retaliation claims."  (Doc. 29-14.)  Bourland later testified that her use of the phrase "cover all the bases" meant she was making sure she had all her questions covered, not that she was trying to prevent Plaintiff from using the commission plan in a retaliation claim after he was terminated.  (Doc. 32-2.)  She also disavowed knowing Plaintiff was going to be terminated.  (*Id.*)  Nevertheless, the fact that Bourland mentioned Plaintiff being

terminated at the outset of the investigation lends support to Plaintiff's contention that the investigation was predetermined.  A reasonable jury could find that this conclusion is bolstered by evidence that Nenow sent Colby an email regarding the investigation, where she reassured him that "it will be fine."  (Doc. 29-13.)

Plaintiff further asserts the investigation was a sham, and his termination predetermined, because it primarily focused on Plaintiff, rather than Colby who was the subject of the Ethics Point complaint.  Bourland testified that she pulled Plaintiff's phone records, emails, annual reviews, and asked all the witnesses about their opinions of Plaintiff, but admitted she did not request similar information about Colby or any other person.  (Doc. 30-4 at 7-8.)  She also acknowledged she did not inquire whether other complaints had been leveled against Colby, although Plaintiff's complaint was the second one against Colby in two months.  (Docs. 29-13; 30-4 at 3-5.)  These facts raise material questions about the actual purpose of the investigation.

Plaintiff's pretext argument is also supported by the timing of his termination.  Colby was notified that Plaintiff needed surgery on his shoulder on April 13, 2015.  (Doc. 29-15.)  The next day on April 14, the Ethics Point investigation was closed.  (Doc. 30 at ¶ 57.)  The day after the investigation was closed, Colby contacted Plaintiff on April 15 to schedule a meeting – a meeting which was apparently intended for his termination.  The meeting was scheduled for

April 22, and Plaintiff was terminated.

The close temporal proximity between when Colby learned Plaintiff needed surgery, the end of the ethics investigation, scheduling Plaintiff's termination meeting, and Plaintiff's termination, could support the inference that Cummins' reason for firing Plaintiff related to his shoulder disability and/or the filing of his complaint, and that the stated reason of insubordination was pretextual. *See e.g. Alwood v. Ecolab, Inc.*, 2016 WL 1451529, *9 (D. Mont. April 12, 2016) (finding manner and timing of termination evidenced that the defendant's reason for discharging the plaintiff was pretextual).

Therefore, drawing all inferences from the facts in the light most favorable to Plaintiff, as the Court must at this stage, a reasonable jury could conclude that the Plaintiff's lack of communication was not the true reason he was terminated. The fact that Plaintiff's lack of communication could have provided good cause, in and of itself, to terminate him, does not prevent Plaintiff from proving that insubordination was used as a pretext to terminate him for some other reason.  *See e.g. Henrichs v. Safeway, Inc.*, 2014 WL 6610046, *7-8 (D. Mont. Nov. 20, 2014) (finding good cause for termination but denying summary judgment due to a fact issue regarding pretext).

Because Plaintiff has come forward with sufficient evidence to create an issue of fact regarding good cause and pretext, his WDEA claim under Mont. Code

Ann. § 39-2-904(1)(b) should survive summary judgment.

## C.    Disability Discrimination

The Montana Human Rights Act ("MHRA") prohibits employers from discriminating against employees on the basis of physical or mental disability. Mont. Code. Ann. § 49-2-101, et seq.  The Americans with Disabilities Act ("ADA") likewise prohibits disability discrimination.  42 U.S.C. § 12101, et seq. Both the MHRA and ADA similarly define "disability" as a physical or mental impairment that substantially limits one or more of a person's major life activities, a record of such impairment, or a condition regarded as having such an impairment.  Mont. Code Ann. § 49-2-101(19)(a); 42 U.S.C. § 12102(1).  "Major life activities" include "concentrating, thinking, communicating, interacting with others, and working."  29 C.F.R. § 1630.2(i)(1)(i).  *See also* 42 U.S.C. § 12102(2)(A).   The term "substantially limits" requires an assessment of "the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).  *See also Estate of Welch v. Holcim, Inc.*, 316 P.3d 823, 828 (Mont. 2014) ("To qualify as substantially limited in the major life activity of work, a person must be 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'").

Disability discrimination claims are subject to the burden shifting framework outlined in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Curley v. City of North Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014); *Reeves v. Dairy Queen, Inc.*, 953 P.2d 703, 706 (Mont. 1998). Under this framework, Plaintiff must demonstrate a prima facie case of disability discrimination. *Id.* To state a prima facie case of disability discrimination, Plaintiff must establish that (1) he has a disability; (2) he was a qualified individual capable of performing essential functions of the job either with or without reasonable accommodation; and (3) that he was unlawfully discriminated against because of his disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). If Plaintiff makes this showing, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Curley*, 722 F.3d at 632; *Reeves*, 953 P.2d at 706. If the employer does so, then the burden shifts back to Plaintiff to prove the reason given by the employer was pretextual. *Id.*

### 1. Whether Plaintiff Has a Disability

The parties do not dispute that Plaintiff's shoulder injury qualifies as a disability. Cummins asserts, however, that Plaintiff's claustrophobia is not a disability because he is self-diagnosed and he has not identified any "major life activity" that is "substantially limited" by his condition. Plaintiff counters that his claustrophobia impairs his ability to concentrate, think, communicate, and work

when enclosed in small spaces.  (Doc. 29 at ¶ 21.)  Plaintiff also points out that he

saw a doctor for the condition.  (Doc. 27-8 at 178.)

The determination of whether an individual has a disability must be made on

a case-by-case basis, based on the particular facts of each case.  *Albertson's, Inc. v.*

*Kirkingburg*, 527 U.S. 555, 566 (1999); *Reeves v. Dairy Queen, Inc.*, 953 P.2d 703,

709 (Mont. 1998); 29 C.F.R. § 1630.2(j)(1)(iv).  Here, Plaintiff has produced

evidence that he obtained a diagnoses of claustrophobia.  (Doc. 27-8 at 178.)

Plaintiff's diagnosis was based on a single visit to Dr. Wagenaar, who indicated

Plaintiff had claustrophobia based on his self-reported symptoms.  (*Id.*)  But even

assuming Plaintiff's evidence is sufficient to show he has claustrophobia, Plaintiff

cannot prove he has a disability on the basis of a diagnosis alone because not every

impairment is a disability.  42 U.S.C. § 12102(1)(A); 29 C.F.R. § 1630.2(j)(1)(ii)

(stating that although the term "substantially limits" is not meant to be a

demanding standard, not every impairment will constitute a disability).  There are

two requirements for an impairment to rise to the level of a cognizable disability:

the impairment must limit a major life activity and the limitation must be

substantial.  *Id.*

Plaintiff has failed to produce any evidence to establish how his

claustrophobia impacts his ability to concentrate, think, communicate, or work.

Dr. Wagenaar's note does not provide any specific information concerning his

condition or address the severity or extent of his limitations.  It states only that Plaintiff "presented with claustrophobia that has been inhibiting his ability to perform his current job."  (Doc. 27-8 at 178.)  Likewise, at his deposition, Dr. Wagenaar testified that he merely identified claustrophobia as a possibility and referred Plaintiff to a behavioral health specialist for evaluation and treatment. (Doc. 27-6 at 7.)  Plaintiff has not submitted any additional evidence to show his claustrophobia has an impact or impairment on a major life activity.  Therefore, the Court finds Plaintiff has failed to show his claustrophobia qualifies as disability under the ADA or MHRA.

  2. <u>Whether Plaintiff Was Unlawfully Discriminated Against Because of His Disability.</u>

It is undisputed that Plaintiff is a qualified individual, at least with regard to his shoulder injury.  Cummins argues, however, that it did not unlawfully discriminate against Plaintiff because his shoulder injury did not play any role in his termination.  But Plaintiff points out that Cummins intended to terminate him for missing work in early March because of his shoulder injury and medication he was taking; that he was again threatened with termination for missing work for health related issued between March 11 and March 17; and that he was terminated within eight days after Colby learned he needed shoulder surgery, and less than three weeks before he was scheduled for surgery.

A jury could reasonably infer from these facts that Plaintiff was terminated

because of his shoulder disability.  Therefore, the Court finds Plaintiff has sufficiently stated a prima facie case of disability discrimination.

3.    Whether the Stated Reasons for Termination are Pretextual

Cummins contends that even assuming Plaintiff makes a prima facie showing, it had a legitimate, nondiscriminatory reason for terminating Plaintiff, namely insubordination.  Plaintiff counters that there are genuine issues of fact regarding whether Cummins' stated reason for termination is pretextual.

Here, the same issues of material fact that preclude summary judgment on the issue of pretext relating to Plaintiff's wrongful discharge claim are germane to Plaintiff's disability discrimination claim.  That is, the circumstances of the internal investigation, and the timing of Plaintiff's termination in relation to the close of the investigation and his need for surgery, create issues of fact as to the whether the Plaintiff's insubordination was the actual reason he was fired.  *See e.g.* *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997) (holding the plaintiff's burden to produce evidence of pretext "is hardly an onerous one: 'the plaintiff [who has established a prima facie case] need produce very little evidence of discriminatory motive to raise a genuine issue of fact' as to pretext.'")

Accordingly, the Court finds there are genuine issues of material fact regarding Plaintiff's disability discrimination claim, and therefore, his claim under the MHRA and ADA based on his shoulder injury should survive summary

judgment.

### D.   Failure to Accommodate

Plaintiff has also asserted a claim that Cummins failed to accommodate his disabilities.  Disability discrimination includes the failure to make reasonable accommodations for an employee who has a physical or mental disability.  Mont. Code. Ann. § 49-2-102(19)(b); *McDonald v. Dep't of Environ. Quality*, 214 P.3d 749, 758 (Mont. 2009).  Employers have a duty to make reasonable accommodations for an otherwise qualified employee, unless it would pose an undue hardship on business operations.  Mont. Code. Ann. § 49-2-102(19)(b); 42 U.S.C. § 12112(b)(5)(A).  Pursuant to this duty, employers have a mandatory obligation to engage in an interactive process with the employee to identify possible reasonable accommodations.  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) *overruled on other grounds by U.S. Airways, Inc. v. Barnett*, 122 S.Ct. 1516 (2002).  The obligation is triggered when an employee gives notice of the employee's disability and the desire for accommodation.  *Id.*  "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process."  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).  Further, the employer's obligation to engage in the interactive process "is a 'continuing' duty that is 'not exhausted by

one effort.'" *Id.* at 1138.

With regard to Plaintiff's shoulder injury, Cummins asserts it accommodated Plaintiff's disability by allowing him to take time off work, accommodating his work schedule so he could attend physical therapy, and approving his request to take time off to have surgery.  The Court finds there is a genuine issue of material fact regarding whether Cummins actually accommodated Plaintiff's shoulder injury.  As Plaintiff points out, when he called in sick in early March 2015 due to side effects from the medication he was taking to treat his shoulder, he was treated as a "no call/no show" and threatened with termination.  (Doc. 30 at ¶¶ 33, 35, 36.) In mid-March, Plaintiff was again told he was in violation of company policy due to his absences for illness and threatened with termination.  (Doc. 27-8 at 166.) Plaintiff was then terminated 8 days after advising Cummins he needed shoulder surgery.  Therefore, Cummins' argument that it fully accommodated Plaintiff's shoulder injury because it approved his "request to have shoulder surgery and take time off to recover" from surgery is directly contradicted by the fact that he was terminated less than three weeks before he was scheduled for surgery.

Considered together, these events create genuine issues of material fact as to whether Cummins accommodated Plaintiff's shoulder injury.  Thus, Plaintiff's claim for failure to accommodate his shoulder injury should survive summary judgment.

With regard to Plaintiff's claustrophobia, the Court has determined that Plaintiff failed to establish it is a disability within the meaning of the ADA. But even assuming Plaintiff's claustrophobia is a disability, the Court finds there are no genuine issue of material fact regarding whether Cummins provided Plaintiff with an accommodation. Plaintiff first raised the issue of his claustrophobia with Colby in November 2014. (Doc. 30 at ¶ 20.) Efforts were made to find an alternate work space at that time, however no solution was reached. (*Id.* at ¶ 22.) On March 10, 2018, Plaintiff inquired about whether Cummins' health insurance would cover counseling for his claustrophobia (Doc. 29-4); and on March 24, he provided Cummins with the note from Dr. Wagenaar, which indicated accommodations may relieve his claustrophobia. (Doc. 27-8 at 175.) Within a week of receiving Dr. Wagenaar's note, Cummins identified an alternate workspace, and offered to help Plaintiff relocate his office. (*See* Docs. 27-7 at 42 (March 31 email from Colby to Plaintiff stating "We are making arrangements for you to move into the cubicle next to Justin's office".); 27-7 at 44 (March 31 email from Colby to Plaintiff stating "the cubicle area is all ready for you to move in . . . please let me know if there are any concerns or if you need assistance in safely moving the items from your previous office area.").

Accordingly, because it is undisputed that Cummins offered Plaintiff an alternate workspace, and did so within a week after receiving medical verification

of the condition, Plaintiff's claim for failure to accommodate his claustrophobia

fails as a matter of law.

## III.    CONCLUSION

Based on the foregoing findings, **IT IS RECOMMENDED** that Cummins'

Motion for Summary Judgment be **GRANTED** as to Plaintiff's claims of disability

discrimination and failure to accommodate related to claustrophobia, and **DENIED**

in all other respects.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy

of the Findings and Recommendation of United States Magistrate Judge upon the

parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendation must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after entry hereof, or

objection is waived.  D. Mont. Local Rule 72.3.

**IT IS ORDERED.**

DATED this 13th day of June, 2018.

TIMOTHY J. CAVAN
United States Magistrate Judge