IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED

SEP 2 4 2018

Clerk, U S District Court
District Of Montana
Billings

| | |
|---|---|
| ROSS MICKEALSON, | CV 16-75-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| CUMMINS, INC., | |
| Defendant. | |

Before the Court are United States Magistrate Judge Timothy Cavan's Findings and Recommendations, filed on June 13, 2018. (Doc. 33). Judge Cavan recommends that this Court grant in part and deny in part Cummins' Motion for Summary Judgment. Cummins timely objected to Judge Cavan's Findings and Recommendations. The parties are entitled to *de novo* review of those findings or recommendations to which they object. 28 U.S.C. § 636(b)(1).

For the reasons discussed below, this Court adopts Judge Cavan's Findings and Recommendations in part and rejects them in part, and grants Cummins' summary judgment in its entirety.

1

## I.   Facts

The parties do not object to Judge Cavan's factual findings.  As a result, the Court adopts the facts as set out by Judge Cavan, and reiterates only those necessary to its analysis below.

## II.   Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson,* 477 U.S. at 249-50.  The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson,* 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.,* 504 F.3d 1017, 1020–21 (9th Cir. 2007).

## III.   Discussion

In his findings and recommendations, Judge Cavan determined that

Cummins was entitled to summary judgment on Mickealson's claustrophobia

related claims of disability discrimination and failure to accommodate.  Judge

Cavan also determined that questions of fact preclude summary judgment on

whether:

(a)   Cummins had good cause to terminate Mickealson for insubordination;

(b)   Cummins' reason for terminating Mickealson was pretextual;

(c)   Cummins discriminated against Mickealson because of his shoulder injury; and

(d)   whether Cummins accommodated his shoulder injury.

Cummins objects and argues that no issues of disputed fact preclude summary

judgment.  The Court addresses these objections in order.

### A.   Wrongful Discharge

Cummins argues that it had good cause to terminate Mickealson's

employment for insubordination because he repeatedly refused to follow

instructions and communicate with his supervisor, William Colby.  (Doc. 28 at 10,

14).  Mickealson argues that Cummins' reason for terminating him was whimsical,

arbitrary, and capricious because he was meeting his performance goals, believed

he could restrict his communication with Colby during the Ethics Point investigation, and was suffering due to disabilities from his medical and psychological conditions. (Doc. 31 at 9-13). After considering Mickealson's explanations for not contacting Colby, Judge Cavan determined that a jury could find that Cummins' reason for Mickealson's termination was whimsical, arbitrary, capricious or unrelated to the needs of the business. (Doc. 33 at 22, 25). Because there is no support in the record for Mickealson's argument, this Court respectfully disagrees.

### 1. Mickealson was Terminated for Good Cause

Montana's Wrongful Discharge from Employment Act states, in relevant part, that a discharge is wrongful if the discharge "was not for good cause and the employee had completed the employer's probationary period of employment." Mont. Code Ann. § 39-2-904(b). "Good cause" is defined as "reasonable job-related grounds for dismissal" based on either: (1) "failure to satisfactorily perform job duties"; (2) "disruption of the employer's operation"; or some other (3) "legitimate business reason." Mont. Code Ann. § 39-2-903(5).

A "legitimate business reason" is one that "is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441 (Mont. 2008) (*quoting Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont.

1993)). The balance between the employer's discretion and "the employee's equally legitimate right to secure employment . . . should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business." *Kestell*, 858 P.2d at 8.

"To defeat a motion for summary judgment on the issue of good cause, the employee may either prove that the given reason for the discharge is not 'good cause' in and of itself, or that the given reason 'is a pretext and not the honest reason for the discharge.'" *Becker*, 191 P.3d at 441 (*quoting Johnson v. Costco Wholesale*, 152 P.3d 727, 734 (Mont. 2007)). In determining whether a factual issue exists, "[a]ll reasonable inferences which can be drawn from the evidence presented must be drawn in favor of the nonmoving party." *Vettel-Becker v. Deaconess Medical Center of Billings, Inc.*, 177 P.3d 1034, 1039 (Mont. 2008).

The initial question is whether Mickealson's continued refusal to follow Colby's instructions and his refusal to communicate with Colby qualified as insubordination and provided Cummins with a legitimate business reason to terminate his employment or, whether Cummins' decision to label his behavior as insubordinate was arbitrary and capricious. This question turns on whether, viewed in the light most favorable to him, Mickealson's explanations for not

communicating with Colby throughout November until April prove he was not being insubordinate.

### a. Mickealson's communication was inadequate

Mickealson argues that the lack of communication alleged by Cummins in support of his termination is false. (Doc. 31 at 6). But the undisputed material facts demonstrate that despite numerous requests by Colby and Cummins' Human Resources, Mickealson repeatedly refused to communicate with Colby from November 2014 to April 2015.

Colby took over as Mickealson's new supervisor in April 2014. (Doc. 30 at ¶ 10). Mickealson did not actually start working full-time for Colby until five months later in late September, however, when Mickealson returned from his unofficial leave of absence to tend to his dad. (Doc. 30-3 at 5). Colby met with Mickealson on November 11, 2014, to set out his performance expectations for Mickealson. (Doc. 30 at ¶ 16). It is undisputed that Colby discussed his expectations and reviewed them in writing with Mickealson. (Doc. 27-7 at 11-13). Colby informed Mickealson that his expectations for Mickealson included:

- "when physically in Billings; you will be residing @ the Billings branch;"

- "answer your phone every time a call comes in if you are not driving or on the other line . . . if you are driving, please safely pull over & accept the call or return the missed call regardless of whether a message is left or not;"

- "a quick email on each Friday recapping the events of the current week & a brief overview of the activities/travel plans for the next two weeks is a new expectation that is being implemented going forward."

(*Id.*).

It is also undisputed that despite discussing and reading these expectations, Mickealson failed to return Colby's calls or text messages in early December. (Doc. 27-3 at 120:20-121:14; Doc. 27-7 at ¶ 8). Although Mickealson cannot remember if he failed to contact Colby or not, (Doc. 30 at ¶ 24), Colby discussed the issue with his direct supervisor, Cummins' Executive Vice President Ken Peterson, (Doc. 27-7 at ¶ 8), and Cummins' Human Resources Business Manager, Karyn Nenow. (Doc. 27-8 at ¶ 6). Colby advised Mickealson that his failure to return calls was unacceptable. (Doc. 27-7 at ¶ 8). Again, while Mickealson cannot remember if this occurred, (Doc. 30 at ¶ 25), Nenow testified that Colby sought her assistance on Mickealson's failure to communicate at the end of 2014 because the communication problems were starting to affect Cummins' business and customers. (Doc. 27-8 at ¶ 6).

Mickealson emailed and reported in sick on March 3, 2015, the day after his review. (Doc. 27-7 at 26). In response, Nenow told Mickealson that "it (sic) extremely important to communicate and OVER communicate with [Colby] . . . ." (Doc. 27-8 at 159), and told Mickealson to contact her and Colby if his doctor recommended additional time off. (Doc. 27-8 at 4). Mickealson did not contact

Colby or Nenow after speaking with his doctor, and did not call or show for work on March 4-6. (*Id.*). By March 10, just a week after Mickealson's review, Colby again specifically instructed Mickealson to call him every day at 8 a.m. to check in and provide Colby with the day's plan because "there is not trust" between them. (Doc. 27-7 at 6, ¶ 12; Doc. 27-7 at 28). The very next day Mickealson failed to call in at 8 a.m. (*Id.* at 28). He emailed Colby at 10:00 p.m. that evening. Acknowledging Colby's requests for communication, Mickealson stated, he "sure did not want to be written up for not calling [] at 8:00 am from the office," (*id.* at 36), but he did not explain his failure to comply that morning, nor did he ask to be relieved from the communication requirements. (*Id.*).

When Nenow confronted him on March 7 about his failure to call Colby as requested, or call her and Colby with his doctors' orders, or show up for work, Mickealson stated he did not understand he needed to call in every day. (*Id.* at 5). Nenow told Michaelson to call Colby when he returned to work on March 10. (*Id.*). Michaelson failed to comply. (*Id.*). He did not call in on March 11, 12, or 13. (*Id.* at 28-29). On Monday, March 16, while Mickealson was out for his shoulder injury, Nenow called Mickealson and told him again that he needed to contact Colby about his workload and customers. (Doc. 27-8 at 5). Mickealson did not call on March 16 or 17. (*Id.* at 11; Doc. 27-7 at 29).

8

Construing the facts in Mickealson's favor, the Court accepts Mickealson's argument that he was excused from communicating with Colby during the pendency of the investigation. Accordingly, the Court excludes the entire time of the investigation, March 17 to April 14, from the analysis. Mickealson's failure to comply with Colby's instructions resumed the next day, however. Mickealson did not call in from April 15-22, (Doc. 27-7 at 8, 33; Doc. 27-8 at 7), he failed to respond to Colby's meeting request for five days, and otherwise failed to communicate with Colby regarding anything other than his shoulder surgery. (*Id.*).

Mickealson argues that Cummins' allegation of a persistent pattern of poor communication suffers from inconsistencies. Specifically Mickealson argues that "had [his] communication actually been such a persistent problem, it would have appeared in his 2014 performance review, as supervisors are supposed to be honest during reviews and Colby admits he raised all major concerns . . . during the review." (Doc. 31 at 11). Mickealson argues that the issue of communication was not raised and he was advised he simply needed to "continue" focusing his attention on communication, a statement he inferred meant he was communicating satisfactorily. (Doc. 30 at ¶¶ 24-27, 30; Doc. 31 at 11).

Construing the evidence in Mickealson's favor, it is undisputed that Colby advised Mickealson that his communication was inadequate during the 2014 performance review. (*See* Doc. 27-7 at 15-24). First, Colby told Mickealson that

"[n]ot returning phone calls in a timely manner if (sic) unacceptable" and that he "need[s] to make sure [he is] returning all phone calls in a timely manner; that includes all customer calls & internal calls." (Doc. 27-7 at 23). Second, in the event that language was not clear, Colby also stated, "Trust: what has been occurring lately is just not working. [Mickealson] needs to build his trust with me & demonstrate that he can meet the needs of the role." (*Id.*). Colby rated Mickealson's competency in responding to "customers, team, and company" at a 2 out of 4, and "need[ing] improvement." (*Id.* at 21). This undisputed evidence proves that Colby not only addressed Mickealson's poor communication in the review; he advised Mickealson it needed to improve.

Mickealson also argues that Colby's failure to place him on a performance improvement plan shows that Cummins' allegation of poor communication was inconsistent with the facts. (Doc. 31 at 11-12). Mickealson argues that Colby never placed him on a performance improvement plan for his communication "as is standard company procedure, even though he had done so before with other employees." (Doc. 31 at 11-12). But Mickealson did not provide any evidence that Cummins' standard procedure was to place employees on performance improvement plans for poor communication. (*See id.*). Similarly, he did not cite to any evidence that Colby had ever placed other employees on a performance improvement plan for poor communication. (*Id.*). A party cannot create a

10

disputed issue of material fact by putting his own interpretations and conclusions on an otherwise clear set of facts. *Koepplin v. Zortman Min., Inc.*, 881 P.2d 1306, 1311 (9th Cir. 1994).

Finally, Judge Cavan accepted Mickealson's argument that a reasonable jury could find that Mickealson believed he did not need to contact Colby while he was out on workers' compensation and treating his shoulder injury. (Doc. 33 at 23). But this argument also lacks any evidentiary support in the record. Mickealson reported his shoulder injury in November 2014. (Doc. 29 at 3). He began physical therapy and received a cortisone injection at that time. (*Id.*). Between November and March, he received medical treatment for his shoulder. (*Id.*). As outlined above, Mickealson was repeatedly advised from November to March that his communication with Colby needed to improve, notwithstanding obtaining medical treatment for his shoulder and attending physical therapy.

Even if Mickealson believed his circumstances changed on March 2, when he began taking narcotics and reported their effects to Colby, Colby immediately told Mickealson that he still expected communication on a daily basis. (*Id.* at 4). At that time, Mickealson told Colby that the medication made him feel woozy and that he did not think he would be safe "out running around." (Doc. 27-7 at 26). When Nenow emailed Mickealson and told him he could take the day off as a result of the narcotics' side effects, she specifically asked him to contact her and

Colby with his doctor's suggestion for future care. (Doc. 27-8 at 159). She

emphasized that it was extremely important for him to "communicate and OVER

communicate with [Colby] *while you treat the workers comp injury* with physical

therapy, doctor's visits, medication, etc...." so that Colby "could make sure the

work gets done while you get the care you need." (*Id.*) (Emphasis added).

Despite these instructions, Mickealson failed to contact Colby or Nenow the

next day, and the two days after that. He also did not come in to work, and did not

contact them after speaking with his doctor. (Doc. 27-8 at 4). On March 7,

Mickealson told Nenow that he did not understand he was supposed to call in

every day. But the undisputed facts show that Mickealson understood Colby's

request for continued communication as of March 10, 2015, and he also

understood that he could be disciplined for failing to follow Colby's orders. (*See*

Doc. 27-7 at 36) (Mickealson email stating "I am supposed to call you every

morning at 8:00 am [to] check in and give you a report of the days plan . . . I sure

do not want to be written up for not calling you at 8:00 a.m. from the office.").

Despite his articulating that he understood Colby's orders, Mickealson did

not call in on March 11, 12, or 13. (*Id.* at 28-29). On Monday, March 16, while

Mickealson was out for his shoulder injury, Nenow called Mickealson and again

told him that he needed to contact Colby about his workload and customers. (Doc.

27-8 at 5). Mickealson did not call. (*Id.* at 11; Doc. 27-7 at 29).

12

Notably, Mickealson does not point to any facts whatsoever supporting his argument that he did not understand what was required of him, or that he was too sick or under such duress that he could not make the calls or come into work, or that he advised Nenow or Colby that he was unable to communicate because of his physical state. Based on the undisputed facts in the record, this Court determines that no reasonable juror could believe that Mickealson thought he was relieved from communicating with Colby as requested while treating his shoulder injury.

After distinguishing the undisputed facts from Mickealson's speculative argument, the Court finds that Colby and Nenow unequivocally requested specific communication from Mickealson over an extended period of time, even when he was out of the office, for whatever reason. Mickealson repeatedly refused to comply with these requests. The Court finds that his refusal was insubordination and provided Cummins with good cause for his termination.

> **b.   Cummins' reason for termination was not whimsical, arbitrary, or capricious.**

Mickealson argues that even if his communication was inadequate, Cummins' reason for his termination was whimsical, arbitrary, or capricious. Mickealson first argues that Cummins, through Colby and Nenow, "acted arbitrarily and unfairly in demanding [the] telephonic check-ins, given Mickealson's health and the pending internal investigation." (Doc. 31 at 14). According to the undisputed facts, Colby requested telephonic check-ins in

November, when Mickealson first returned from his long-term absence, nearly four months before Mickealson initiated the investigation and started taking narcotics that affected his health. (*See* Doc. 27-7 at 13, "[A] quick email on each Friday recapping the events of the current week & a brief overview of the activities/travel plans for the next two weeks is a new expectation that is being implemented going forward."). Construing the facts in Mickealson's favor, and removing March 17 to April 14 from the analysis for the investigation, Mickealson does not explain why Colby and Nenow's requests for communication from November to March and half of April were whimsical, arbitrary, or capricious.

With respect to Colby's request for communication after Mickealson began taking narcotics, Mickealson argues that, "terminating [him] for failing to make daily check-in phone calls from the office while he was reeling from the effects of medication prescribed to treat a workplace injury" was arbitrary and capricious. (Doc. 31 at 13). Construing the facts in the light most favorable to Mickealson, beginning on March 2, Mickealson stated he suffered from "the physical side effects of the Tramadol" which made him "drowsy and affected his balance," (Doc. 29 at ¶¶ 11-12), "severe anxiety" from being in his small office, (*id.* at ¶ 21), and "stomach issues from the anxiety, stress, and effects of [his] pain medication." (*Id.* at 25). Only two of these ailments – the effects of the narcotics and stomach issues – caused him to request time off work, and only on two occasions. (Doc. 29

14

at 4, 8). According to the undisputed facts, Mickealson simply failed to come to work, or communicate with Colby during the other times at issue.

Construing the facts in Mickealson's favor, nothing in the record shows that he was unable to comply with Colby's requests for daily check-ins or that he ever requested to be relieved of his communication obligations because of his health. The undisputed facts show, however, that during the same time frame that he failed to communicate with Colby because he was "reeling from the effects of medication," Mickealson scheduled a branch visit, (Doc. 27-7 at 28), completed required classes, (*id.*), communicated with customers regarding projects and commissioning, (*id.* at 29), and as of March 10, "was very close to completing a $1.5 million sale at Stillwater Mine." (Doc. 29 at 5). Considering Mickealson's ability to continue completing these other work tasks while under the effects of his prescription medication, Colby's repeated requests for a daily call-in were reasonable and related to the needs of the business.

Next, Mickealson argues that "to terminate an employee for following orders from higher up the organizational hierarchy during a contentious internal investigation is clearly whimsical, arbitrary and capricious." (Doc. 31 at 12). He argues that Rolana Bourland, the Cummins internal investigator, told him he could limit his direct communication with Colby during the investigation, so Cummins' decision to terminate him for failure to communicate is whimsical, arbitrary and

15

capricious. According to the undisputed facts, however, Bourland was not "higher up" the organizational hierarchy. She was a Human Resources Business Partner with no supervisory authority over Mickealson. (Doc. 30 at ¶ 53). Nevertheless, construing the facts in Mickealson's favor and assuming he believed Bourland relieved him of his responsibility of communicating with Colby during the investigation, the investigation lasted less than a month, from March 17 to April 14. (Doc. 27-7 at 8, 33; Doc. 27-8 at 7). Removing that time frame from the analysis leaves nearly four months that Mickealson refused to communicate as Colby requested.

The undisputed facts demonstrate that Cummins' reason for discharge was not whimsical, arbitrary, or capricious. While Cummins' reason for Mickealson's discharge is in and of itself good cause, Mickealson's claim may survive summary judgment if he can show there is a genuine issue of material fact as to whether that reason was simply a pretext and not the honest reason for his discharge. *See Becker*, 191 P.3d at 441.

## 2. Pretext

To defeat summary judgment on the issue of pretext, "the employee 'must prove that the given reason for the discharge . . . is a pretext and not the honest reason for the discharge." *Arnold v. Yellowstone Mountain Club, LLC*, 100 P.3d 137, 142 (Mont. 2004). A plaintiff may prove pretext using either direct or

circumstantial evidence. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998). "Direct evidence is evidence which, if believed, proves the fact of the discriminatory animus without inference or presumption." *Id.* "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* In contrast, when direct evidence is unavailable, and the plaintiff proffers only circumstantial evidence that the employer's motives were different from its stated motives, "specific" and "substantial" evidence of pretext is required to survive summary judgment. *Id.* at 1222.

Mickealson relies on circumstantial evidence to challenge the legitimacy of Cummins' reason for his termination. He argues that Cummins actually terminated him for requesting accommodations for his disabilities and because he submitted an internal grievance against Colby. (Doc. 31 at 23). Mickealson supports his pretext claim by pointing out that his termination occurred when he was struggling from a workplace injury and claustrophobia triggered by being forced to spend more time in the office. (*Id.* at 24). He argues that when he sought accommodations for these disabilities he received "hostility" in return. (*Id.*). In support of this argument, however, Mickealson cites only to his affidavit where he stated that Human Resources "became uncooperative and critical," (Doc. 29 at ¶

12), and that "based on his interactions . . . and email exchanges . . . the stated reason for his termination was pretextual." (*Id.* at ¶ 39).

In support of his argument that Cummins' Human Resources became hostile to his requests for time off, Mickealson argues in his affidavit that in a March 17, 2015, email, Nenow "directly threatened to fire [him] because of [his] medical absences and failure to continue working while home sick." (Doc. 29 at 8). This assertion is simply false.

Nenow did not threaten to terminate Mickealson. (*See* Doc. 29-8). She reminded Mickealson that he had not contacted her or Colby after he spoke with his doctor, as they had requested, and that he was required to get clearance from his doctor to return to work per Cummins' absenteeism policy. (*Id.* at 1). She also advised him that his failure to communicate with Colby was considered insubordination and was a prohibited activity. (*Id.*). Construing the facts in Mickealson's favor, Nenow did not threaten to fire him because of his medical absences or his failure to work from home while sick anywhere in the email. It is worth reiterating that a party cannot create a disputed issue of material fact by putting his own interpretations and conclusions on an otherwise clear set of facts, however. *Koepplin*, 881 P.2d at 1311.

Notwithstanding his perception that Human Resources became uncooperative, Mickealson fails to point to any "specific" or "substantial" evidence

18

that his alleged disabilities resulted in any disparate treatment, or more importantly, were the real reason for his termination. Notably, in his affidavit, Mickealson acknowledges that Nenow directed him to pursue counseling and "even informed [him] of available health insurance coverage covering such counseling" for his claustrophobia, and that Colby suggested he call Cummins' toll-free number. (Doc. 29 at 7). He does not dispute that shortly after he provided a doctor's note regarding his claustrophobia, a new office was provided for him. (*Id.* at 10). The Court finds Mickealson's interpretation of the situation insufficient to create a genuine issue of material fact on the issue of pretext.

Mickealson's argument that he was terminated for filing an internal grievance against Colby is similarly unsupported by any factual evidence. This pretext argument is based on his speculation that the investigation was a "sham" and the investigator discussed terminating him prior to the resolution of the grievance. (Doc. 31 at 25). But Mickealson has not pointed to any facts to support his argument that his internal grievance was the actual reason for his discharge. He argues that Bourland did not investigate Colby, but instead investigated him. (Doc. 31 at 24). Assuming this is true, it does not provide any support for his argument, since Bourland conducted the investigation independently from Colby and had no authority to terminate Mickealson.

Mickealson also argues that since Bourland mentioned termination in an email, his termination was predetermined. (*Id.* at 25). But Mickealson had initially raised the issue of potential termination in his March 17, 2015, complaint. (Doc. 27-4 at 13). Accordingly, the questions pertaining to his termination were properly included in the investigation. Mickealson again fails to point to any "specific" or "substantial" facts that could show, or imply, that the given reason for the discharge was "not the honest reason for the discharge." *Becker*, 191 P.3d at 441.

The only potentially valid circumstantial evidence that Mickealson points to is the timing of his termination. Mickealson correctly argues that very close temporal proximity of the protected activity and the adverse employment action can serve as evidence of pretext. *See, e.g., Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1069-70 (9th Cir. 2003). However, temporal proximity standing alone is not sufficient to raise a genuine issue with respect to pretext. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1069-70 (9th Cir. 2003); *Mitchell v. Superior Court of Cal. County of San Mateo*, 312 Fed.Appx. 893, 894 (9th Cir. 2009) (upholding summary judgment in favor of Defendant, stating that Plaintiff "has not offered any evidence other than the 'timing' to rebut what otherwise appears to be an effort by an employer to confront ballooning discoveries regarding an employee's inappropriate behavior"); *see also Hudson v. Chertoff*,

2007 WL 2288062, *9 (W.D. Wash. 2007) (stating that temporal proximity alone "does not constitute 'specific' or 'substantial' evidence").

Although Mickealson presents evidence that he was terminated after he reported his disabilities, Mickealson's temporal proximity claim is distinguishable from others that have withstood summary judgment. The timing of Mickealson's termination alone, accompanied by evidence of his longstanding communication problems, the "needs improvement" rating on his performance review, and his repeated failure to follow Colby's orders, coupled with a complete lack of evidence of retaliatory intent, is neither specific nor substantial circumstantial evidence. *Cf. Kotewa v. Living Indep. Network Corp.*, 2007 WL 433544, *10 (D. Idaho 2007) ("[T]he fact plaintiff was terminated within a few days of sending her [complaining] email alone may not establish circumstantial evidence of pretext, but when the timing is combined with the fact Kotewa had a good performance review the month before her termination, this is specific and sufficient circumstantial evidence of pretext to allow plaintiff to survive summary judgment."). As a result, the Court concludes that the evidence of temporal proximity is not a "specific and substantial" indicator of pretext here.

Cummins submitted evidence sufficient to meet its initial burden of showing good cause for Mickealson's termination. Mickealson failed to respond with material and substantial evidence to raise genuine issues of material fact as to

whether Cummins had legitimate business reasons for discharging him, or that the discharge was false, or pretextual. Accordingly, the Court grants Cummins' motion for summary judgment on Mickealson's wrongful discharge claim.

## B.    Mickealson's Shoulder Disability Discrimination Claim

Cummins argues that Judge Cavan erred in finding that a genuine issue of fact exists on whether Mickealson was discriminated against because of his shoulder injury and whether Cummins accommodated his injury. Cummins argues there is no evidence that Mickealson's termination stemmed from any animus related to his shoulder injury.

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). To state a prima facie case of discrimination under the ADA based on the termination of his employment, Mickealson must show that (1) he is a disabled person within the meaning of the ADA; (2) he is a qualified individual, meaning he can perform the essential functions of his job; and (3) Cummins terminated him because of his disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). Here, Mickealson cannot show the third element necessary to establish a prima facie case.

Mickealson argues that his termination "partially" stemmed from his disability. (Doc. 27-1 at 65). Ultimately, however, he fails to explain how

Cummins discriminated against him because of his shoulder injury. Judge Cavan relied on Mickealson's argument that Cummins intended to terminate him for missing work early in March because of his shoulder injury and medication, that he was threatened with termination for missing work for health related issues between March 11 and 17, and that he was terminated within eight days after Colby found out he needed shoulder surgery. (Doc. 33 at 32). This Court finds that these arguments proffered by Mickealson have no evidentiary support in the record, however.

Mickealson's characterization of Cummins' Human Resources' response to his sick leave and that Cummins intended to terminate him in early March is unsupported by the evidence. Nowhere in the record is there any evidence that Mickealson was threatened with termination for taking time off for his injury. Rather, the undisputed facts demonstrate that he was reminded of Cummins' "no-call/no show" three day unapproved leave policy, and advised that his continued failure to communicate with Colby was in violation of Cummins' Facility Rules and Responsibilities policy. (Doc. 29-8 at 1). He was advised that he could be disciplined up to and including termination, for violating the policies, not for taking sick leave. (*Id.*). In other words, Mickealson was advised that failing to call in for three days was unacceptable, not that taking time off was an issue. Notably, Cummins gave Mickealson the benefit of the doubt for his three day absence and

23

opted not to terminate him for the no-call/no show violation. (Doc. 30 at ¶¶ 35-37). None of the evidence before the court connects Cummins' "threats of termination" with Mickealson's shoulder injury.

Mickealson fails to produce any actual evidence that Cummins discriminated against him for his shoulder disability. His mischaracterization of the facts does not create genuine issues of fact. For that reason, his disability claim fails.

## C.  Mickealson's Failure to Accommodate Claim

Disability discrimination includes the failure to make reasonable accommodations for an employee who has a physical or mental disability. Mont. Code. Ann § 49-2-102(19)(b); *McDonald v. Dep't of Environ. Quality*, 214 P.3d 749, 758 (Mont. 2009). To establish a prima facie case for failure to accommodate under the ADA, it is the plaintiff's burden to show: (1) he is a disabled person within the meaning of the Act; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of the disability. *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003).

Here, the third element is disputed, but again, as discussed above, Mickealson fails to provide any evidence of an adverse employment action that occurred because of his disability. The evidence shows that every adverse

employment action occurred directly as a result of his failure to follow Colby's directions and his failure to communicate with Colby.

Mickealson was allowed time off for physical therapy and medical appointments for his shoulder beginning in November 2014 through April 2015, after Colby specifically required that he report his shoulder injury to Human Resources. (Doc. 27-3 at 95:12-96:1; Doc. 27-1 at 147:12-148:12; 298:9-21). When Mickealson requested time off in March 2015 because of the effects of his medication, he received the time off, despite repeatedly failing to follow Nenow and Colby's directions. (*See* Doc. 27 at 10-14). In fact, Mickealson was out of the office on sick leave from March 3, 2015 to March 9, 2015, and then again from March 11, 2015 to April 1, 2015. (*Id.*) While Mickealson alleges that he was "criticized and badgered" for taking sick leave, the evidence plainly demonstrates that his sick leave was not the issue; the issue was his failure to communicate. (*Id.*). Mickealson fails to provide the Court with any evidence in support of his argument that he suffered an adverse employment action because of his shoulder disability.

## III.    Conclusion

For the reasons discussed above, Judge Cavan's Findings and Recommendations (Doc. 33) are ADOPTED IN PART and REJECTED IN PART,

consistent with this Order. IT IS FURTHER ORDERED that Cummins' Motion for Summary Judgment (Doc. 26) is GRANTED in its entirety.

DATED this _24th_ day of September 2018.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge